Filed 3/11/25  In re Wroten on Habeas Corpus CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re<br><br>DAVID RAY WROTEN<br><br>on<br><br>Habeas Corpus. | B341170<br><br>(Los Angeles County<br>Super. Ct. No. BA268267) |

ORIGINAL PROCEEDINGS.  Robert C. Vanderet, Judge. Petition denied.

Marilee Marshall, under appointment by the Court of Appeal, for Petitioner.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill and Thomas C. Hsieh, Deputy Attorneys General, for Respondent.

_____

David Ray Wroten (petitioner) was convicted by a jury in 2005 of one count of first degree murder (Pen. Code,[1] § 187, subd. (a), count 3) and two counts of attempted murder (§§ 664/187, subd. (a), counts 4 & 5).

In December 2023, petitioner filed this petition for writ of habeas corpus in the California Supreme Court seeking to overturn his conviction on count 5, for attempted murder.[2]  The Supreme Court issued an order to show cause, returnable before this court, on why petitioner is not entitled to relief on the ground that his conviction in count 5 is invalid pursuant to *People v. Canizales* (2019) 7 Cal.5th 591 (*Canizales*) and *People v. Mumin* (2023) 15 Cal.5th 176 (*Mumin*).  We appointed counsel for petitioner and have reviewed the parties' briefing on the matter.  We conclude that the petition is properly denied.

## FACTS AND PROCEDURAL HISTORY

### I.     Facts

We summarize pertinent facts from this division's 2007 opinion affirming petitioner's conviction.  (*People v. Wroten* (Dec. 26, 2007, B188462) [nonpub. opn.].)

On July 4, 2004, at approximately 9:30 p.m., Durand Sipple, a Black P-Stone (BPS) gang member, and another person were shot and killed on August Street, in BPS gang territory.

Approximately one-half hour later, Darlene Coleman was in an alley outside her residence, near Degnan Boulevard and 43rd Street, in Los Angeles, when her neighbor, Derrick Darden, wearing a blue and white hat, pulled into the alley in his white car.  The location was in the heart of the territory of the Rolling 40's Crips gang, which had the gang color of blue and which was a rival of BPS.  Neither Coleman nor Darden were gang members.  Darden exited his car, stood two feet from Coleman and conversed with her.

---

[1] Undesignated statutory references are to the Penal Code.

[2] We previously denied, in October 2023, a similar petition.

They were still talking 15 minutes later when Coleman turned to leave. As she did, Darden saw two African-American men 12 to 15 feet away, approaching and shooting at them. Coleman began screaming and ran to her porch, and Darden followed. He was shot in the right arm. When the shooting stopped, one gunman lay in front of Darden's car. He died a day and a half later from a single gunshot wound to the back of the neck.

Police officers responded to the scene and found an African-American male, identified as Gerald Mosley, a BPS gang member known as "Little Bool Aid," facedown, with a gunshot injury. A .38-caliber, five-shot revolver, with three spent and two live rounds inside, was found under him. Two .38-caliber bullet casings were located at the crime scene. Five .32-caliber casings were also found and later determined to have been fired from the same gun. Bullet fragments, a bullet jacket and a bullet core were recovered from Mosley during his autopsy. One was likely a .32-caliber bullet that came from the same firearm as a .32-caliber bullet jacket recovered from the crime scene. The bullet taken from Mosley's body was not fired from the gun found under him.

Morris Phillips, a BPS gang member, gave a recorded statement to detectives in which he identified Mosley as "Bool Aid." He said he was aware of the shootings on July 4, 2004, and identified a photo of petitioner as "Roe," whom Phillips had also heard called "Mayhem." Phillips said that petitioner told him that he and Bool Aid went to the Rolling 40's area and began shooting at a car, and the next thing petitioner knew, Bool Aid was on the ground. At trial, Phillips testified that, on the night of the shooting, petitioner stated that he "went [to the] 40[']s" with Bool Aid to do a "retaliatory shooting" and Bool Aid was shot.

Chris Smith was a close, longtime friend of petitioner. In October 2004, Detectives David Garrido and Robert Lait gave Smith and his brother a ride home, and surreptitiously recorded their conversation.

Smith said that petitioner stayed with him after the July 4, 2004 shooting, told him he did not know how Mosley was shot, and began crying. Petitioner told Smith that only he and Mosley went to Degnan Boulevard and that petitioner shot five times and Mosley got in front of him. Smith said he was sure it was an accident. Detective Garrido testified that Smith said that petitioner told him that petitioner and Mosley were doing a "mission," that petitioner fired five shots, and that Mosley was hit when he moved into petitioner's line of fire.

Petitioner was arrested and interviewed by Detectives Garrido and Lait. He admitted that he was "with" the Rolling 20's gang. After initially denying involvement in the shooting, petitioner stated that he, Mosley, and another BPS gang member obtained firearms after Sipple was shot. Petitioner stated that the three proceeded to the alley near Degnan Boulevard, where they saw a white car with its door open. While petitioner was "dumping" his gun, toward whom he thought were "dudes" standing by the white car, Mosley fell down. Petitioner said that he shot at Rolling 40's gang members in retaliation for the Rolling 40's shooting of Sipple in BPS's territory. He eventually admitted shooting five or six times, and using a .32-caliber gun.

A gang expert testified that BPS was a "Blood" gang whose colors were red, and which got along with the Rolling 20's gang, another Blood gang, but not with the Rolling 40's Crips gang. The expert opined that the shooting near Degnan Boulevard benefited, was in association with, and was at the direction of the BPS gang. The gang was known for quick retaliation, and the shooting was consistent with a retaliation for the killing of Sipple, a BPS gang member, 45 minutes earlier. Darden was wearing a blue hat, the Rolling 40's gang color. The shooting was in the Rolling 40's gang territory and benefited BPS because it sent a message that it would not tolerate killing of its members.

## II. Procedural Background

As relevant to this petition, petitioner was charged with first degree murder (count 3) as to the killing of Mosley, and two counts of

attempted murder, count 4 pertaining to Darden and count 5 to Coleman.  Firearm and gang enhancements were also alleged.

At trial, the jury received, among other instructions, the following "kill zone" instruction: "A person who primarily intends to kill one person, may also concurrently intend to kill other persons within a particular zone of risk.  This zone of risk is termed the kill zone.  The intent is concurrent when the nature and scope of the attack, while directed at a primary victim, are such that it is reasonable to infer the perpetrator intended to kill the primary victim by killing everyone in that victim's vicinity.  Whether a perpetrator actually intended to kill the victim, either as a primary target or as someone within a kill zone is an issue to be decided by you."

In closing argument, the prosecutor argued that a conviction on count 5, for the attempted murder of Coleman, was appropriate under a kill zone theory.[3]  The prosecutor stated:  "And you are going [to] have an instruction about kill zone or concurrent intent.  Just because she wasn't hit doesn't mean she wasn't being shot at.  And this is what this kill zone thing is all about.  If somebody shoots into a car, seeing two people but only trying to hit one, but the other people are in what is termed the kill zone, you are still liable for attempted murder of them. . . .  If they are in the kill zone, it's not defined as a concrete thing, but if they are in the area of the kill zone, taking shots in that area, they are also victims of attempted murder."  The prosecutor continued, when arguing that petitioner did not commit a mere assault against either Darden or Coleman, that he was "shooting to kill" in a "retaliatory shooting."  Earlier in closing argument, when discussing the death of Mosley, the prosecutor stated:  "When one attempts to kill a certain person Derrick Darden and Darlene Coleman over by their car—but by mistake or inadvertence kills a different person—Bool

---

[3] The prosecutor only made a kill zone argument with respect to the attempted murder of Coleman, not Darden.

Aid—the crime, if any committed, is the same as though the person originally intended to be killed, Derrick Darden, had been killed."

Petitioner's trial counsel, in closing argument, did not dispute, or even address, the kill zone theory or intent to kill element. Instead, counsel argued that petitioner was not the shooter and had falsely confessed to the shooting.

The jury found petitioner guilty of counts 3 through 5, and found that the attempted murders (counts 4 and 5) were committed willfully, deliberately and with premeditation. It also found the enhancements true as to counts 3 through 5. Petitioner was sentenced, on count 3, to a prison term of 25 years to life plus a 20-year determinate term for the firearm-use enhancement, on count 4, to a consecutive life term with a minimum 15 years before parole eligibility plus a consecutive 25 years to life for the firearm-use enhancement and, on count 5, to a consecutive life term with a minimum of 15 years before parole eligibility plus a consecutive six years eight months for the firearm-use enhancement.

In affirming petitioner's convictions in our 2007 opinion, we rejected, among other claims, an argument that the evidence did not support a finding of specific intent to kill Coleman, including under the kill zone theory. The opinion noted, in pertinent part, that petitioner "and his associates created a 'kill zone' in the Degnan alley." He saw "dudes" "standing near the car," and "said that the men he saw were Rolling 40's gang members. He retaliated by shooting them, intending to hit any Rolling 40's gang members he could." He " 'dumped' his gun, firing five or six bullets," and his and his associates' bullets "were sprayed throughout the immediate area, hitting Darden's car and a nearby building. The fact that appellant may not have known Coleman's gender does not insulate him from culpability for shooting at her as she stood in the 'kill zone.' " The analysis concluded, "[t]here was no evidence that [Coleman] had left the 'kill zone' before the

6

shooting began.  Appellant unloaded his gun on his targets, intending to kill everyone in the area." (*People v. Wroten, supra*, B188462.)

**DISCUSSION**

Petitioner contends that his conviction on count 5, for the attempted murder of Coleman, must be vacated because the trial court improperly gave a kill zone instruction and the instruction given was erroneous.  We consider this claim in light of *Canizales* and *Mumin*.

## I.     The Kill Zone Theory, as Explained by *Canizales* and *Mumin*

The crime of attempted murder requires proof of " 'the specific intent to kill.' " (*Canizales, supra,* 7 Cal.5th at p. 602.)  Moreover, "the intent to kill element must be examined independently as to each alleged attempted murder victim; an intent to kill cannot be 'transferred' from one attempted murder victim to another under the transferred intent doctrine." (*Ibid.*, citing *People v. Bland* (2002) 28 Cal.4th 313, 327–328 (*Bland*).)  Because direct evidence of intent to kill is rare, intent generally must be inferred from circumstances surrounding the crime, as well as the defendant's actions and statements.  (*Canizales,* at p. 602.)

In *Bland*, our Supreme Court endorsed the concept of a "concurrent intent" to kill, noting that "a primary intent to kill a specific target does not rule out a concurrent intent to kill others." (*Bland, supra,* 28 Cal.4th at pp. 330–331, fn. 6.)  In so reasoning, the court found that the facts in that case "virtually compel[led]" an inference that the defendant, who shot numerous rounds into a vehicle as it drove away, not only intended to kill the primary target, a rival gang member, but "also, concurrently, intended to kill the others in the car," or "[a]t the least, he intended to create a kill zone." (*Id.* at p. 333.)

Later, in *Canizales*, the Supreme Court described the limits of the kill zone theory, explaining that it "may properly be applied only when a jury concludes:  (1) the circumstances of the defendant's attack on a primary target . . . are such that the only reasonable inference is

7

that the defendant intended to create a zone of fatal harm—that is, an area in which the defendant intended to kill everyone present to ensure the primary target's death . . . and (2) the alleged attempted murder victim who was not the primary target was located within that zone of harm." (*Canizales, supra,* 7 Cal.5th at p. 607.) The kill zone requirements are not satisfied when the evidence merely shows that a defendant "who intends to kill a primary target acted with only conscious disregard of the risk of serious injury or death for those around a primary target." (*Ibid.*)

*Canizales* articulated a number of factors to consider when determining "the defendant's intent to create a zone of fatal harm and the scope of any such zone." (*Canizales, supra,* 7 Cal.5th at p. 607.) These factors include: "the type of weapon used"; "the number of shots fired (where a firearm is used)"; "the distance between the defendant and the alleged victims"; "the proximity of the alleged victims to the primary target"; whether the location of the attack had "limited means of escape"; and whether a victim in a shooting was "hit by any of the shots." (*Id.* at pp. 607, 611.) Additionally, the *Canizales* opinion emphasized the limited circumstances in which a trial court may properly instruct a jury on a kill zone theory—"only in those cases where the court concludes there is sufficient evidence to support a jury determination that the *only* reasonable inference from the circumstances of the offense is that a defendant intended to kill everyone in the zone of fatal harm." (*Id.* at p. 608.)

More recently, in *Mumin, supra*, 15 Cal.5th 176, our Supreme Court clarified the proper application and scope of the standards announced in *Canizales*. The *Mumin* decision resolved a conflict that had arisen following *Canizales* regarding the correct standard of review to employ when analyzing a trial court's decision to give a kill zone instruction. (*Mumin,* at pp. 187–188.) In addressing the conflict, *Mumin* explained that "*Canizales* did not articulate a different or higher standard of review in concurrent intent cases." (*Mumin,* at

p. 203.)  Instead, *Mumin* confirmed that "*Canizales* did not depart from the traditional substantial evidence inquiry.  The analysis at both the trial and appellate level looks to whether substantial evidence supports giving the challenged instruction." (*Mumin,* at p. 198.)  The decision further explained that, when undertaking this substantial evidence review, "an appellate court retrospectively inquires whether a rational trier of fact *could have* found the defendant guilty beyond a reasonable doubt, based on all the evidence when viewed in the light most favorable to the prosecution." (*Id.* at p. 199.)

The *Mumin* court synthesized its standard of review analysis as follows:  "On review the test remains whether substantial evidence had been presented to support a reasonable inference by the jury 'that defendant[] intended to create a zone of fatal harm around a primary target.' " (*Mumin, supra*, 15 Cal.5th at p. 203.)  Stated in more specific terms, substantial evidence of the following facts are required to satisfy a kill zone theory:  "1. the defendant intended to kill a primary target; 2. he concurrently intended to achieve that goal by killing all others in the fatal zone he creates; and 3. the alleged attempted murder victim was in that zone." (*Ibid.*)

*Mumin*, largely following the factors laid out in *Canizales*, determined that substantial evidence did not support a concurrent intent instruction that had been given by the trial court in that case. The defendant in *Mumin* fired three shots.  *Mumin* noted that "[a]lthough three shots might be sufficient to create a zone of fatal harm around a primary target in a confined space or in the midst of a tight group," the defendant fired from a confined room out into an open area. (*Mumin, supra*, 15 Cal.5th at p. 205.)  Second, neither victim was hit, and "the absence of injury to a secondary target is one factor to consider in determining whether the defendant intended to kill secondary targets." (*Ibid.*)  Third, the secondary victim was at least 25 feet away from the primary target, a fact that was relevant because "generally, the farther away a secondary victim is from a primary

9

target, the greater the force necessary to demonstrate an intent to create a lethal zone encompassing both the primary target and the others the defendant is alleged to have concurrently intended to kill." (*Ibid.*)

Finally, *Mumin* found that the concurrent intent instruction given by the trial court was "not legally sound," and neither was the prosecution's argument on the kill zone theory. (*Mumin, supra*, 15 Cal.5th at pp. 208–210.) *Mumin* explained that, unlike a situation where an improper theory " 'is incorrect only because the evidence does not support it,' " in which case reversal generally "is not required if 'a valid ground for the verdict remains,' " if the jury, in contrast, is presented with a "legally inadequate theory" that is " 'contrary to the law,' " reversal is required "unless the error was harmless beyond a reasonable doubt." (*Id.* at p. 207, citing *People v. Aledamat* (2019) 8 Cal.5th 1, 7–8 (*Aledamat*).) *Mumin* applied this *Chapman* standard (*Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 17 L.Ed.2d 705] (*Chapman*)), which "permits an affirmance only when, 'after examining the entire cause, including the evidence, and considering all relevant circumstances, [the court] determines the error was harmless beyond a reasonable doubt,' " in reversing the subject attempted murder conviction. (*Mumin,* at pp. 210–211.)

## II.  Substantial Evidence Supported a Kill Zone Instruction

As noted above, while *Canizales* narrowed the application of the kill zone doctrine, it did not preclude its use in cases where the evidence supports a finding of concurrent intent. Per *Mumin*, in examining whether a kill zone instruction was properly given in this case, we determine whether substantial evidence was presented that petitioner intended to kill a primary target by concurrently intending to kill all others in a fatal zone he created, and that the attempted murder victim was in that zone. (*Mumin, supra*, 15 Cal.5th at p. 203.)

The relevant evidence abundantly supported the finding that petitioner intended to kill Derrick Darden, the primary target, by also

10

killing Darlene Coleman, who was also in the kill zone. The shooting was a premeditated act of gang retaliation. Testimony established that petitioner, a member of the Rolling 20's gang, sought revenge with ally BPS gang members for the killing of gang member Sipple, a shooting they believed was committed by the rival Rolling 40's gang. Expert testimony confirmed that the shooting aligned with the BPS characteristic of quick retaliation. Indeed, the evidence showed that petitioner and Mosley planned a "mission" to Rolling 40's territory and obtained firearms with the intent to shoot Rolling 40's gang members. Petitioner admitted to officers that he shot at perceived Rolling 40's gang members in retaliation for the Rolling 40's shooting of Sipple in BPS's territory. Petitioner's intent to kill was properly inferred from his own actions and statements, as well as the surrounding circumstances evidencing a retaliatory gang action for the recent murder of Sipple. (See *Canizales, supra,* 7 Cal.5th 591, 602 [intent may be inferred from surrounding circumstances and defendant's actions and statements].)

Moreover, the circumstances of the shooting itself demonstrated an intent to kill everyone in the kill zone. Petitioner "dumped" his gun, firing five to six times while as close as 12 feet away from Darden and Coleman. (See *Washington v. U.S.* (D.C. 2015) 111 A.3d 16, 24, cited by *Canizales, supra,* 7 Cal. 5th 591, 610 [concurrent intent instruction was supported by evidence that the defendant stood 21 feet away and fired 10 gunshots at four people in close proximity to one another, hitting three of them].) Coleman was standing just two feet from the primary target Darden, who was wearing a blue hat, the color worn by Rolling 40's gang members, in the heart of Rolling 40's territory. Although Coleman may have turned to leave just when the shooting began, the evidence showed that she had not yet left Darden's side. As *Mumin* instructs, the fact that petitioner fired at a "defined group in close proximity to each other strengthens the inference that the creation of a kill zone was intended." (*Mumin, supra*, 15 Cal. 5th at p. 204.) In

11

contrast, the alleged secondary target in *Mumin* was positioned 25 feet away from the primary target. (*Id.* at p. 205.) Given the proximity of Darden and Coleman, the force used by petitioner was certainly great enough to create a lethal zone.

Additionally, the fact that Darden was hit by a bullet further strengthens the inference that petitioner intended to create a kill zone. (See *Canizales, supra*, 7 Cal.5th at p. 611 [inference of intent informed by whether any alleged targets were struck by bullets].) And, while Darden and Coleman were not standing in a severely confined space when the shooting occurred, they were hemmed in on at least one side by Darden's car, which had its door open, and were located near an alleyway, limiting the means of escape. This setting was starkly different from the one in *Canizales*, where the gunman fired from 100 or 160 feet on a "wide city street." (*Ibid.*) Moreover, evidence in this case showed that there were two bullet holes in Darden's car, Mosley was killed about a foot away from the car, and Darden was leaning on his car when the shots commenced, with Coleman nearby.

In sum, petitioner, while engaged in a retaliatory "mission," fired at least five shots from a close distance into a relatively confined area, targeting Darden, who was standing next to a perceived "dude" rival gang member (actually, Coleman), in rival gang territory. There was clearly substantial evidence for the jury to reasonably find that petitioner intended to kill the primary target, Darden, by concurrently intending to kill everyone in the kill zone, and that Coleman was in that zone. The kill zone instruction underlying the attempted murder conviction in count 5 was thus supported by substantial evidence.

## III.   Error in the Instruction Was Harmless Beyond a Reasonable Doubt

Our finding that substantial evidence supported a kill zone instruction does not end our inquiry. The jury trial in this case predated *Canizales* by approximately 14 years, and (perhaps not surprisingly) the kill zone instruction, and the prosecutor's kill zone

argument, did not comply with *Canizales's* strict requirements. We therefore must examine the effect of the inadequate theory that was presented to the jury.

We start by acknowledging that the kill zone instruction given in this case was better than some. As noted in *Canizales*, past versions of the theory were "incomplete to the extent that they do not require a jury to consider the circumstances of the offense in determining the application of the kill zone or imply that a jury need not find a defendant intended to kill everyone in the kill zone as a means of killing the primary target." (*Canizales, supra,* 7 Cal.5th at p. 607, fn. 5 [collecting cases].) For example, in *People v. Windfield* (2016) 3 Cal.App.5th 739, 756, the court found that the kill zone theory was satisfied when "the jury could reasonably conclude that [defendants] intended to ensure harm to the murder victim by harming everyone in his vicinity." In contrast, the instruction in this case left no room for a finding of the required intent based merely on a finding that petitioner intended to "harm" those in the kill zone. Instead, the jury here was instructed that the theory required an intent "to kill the primary victim by killing everyone in that victim's vicinity," and that the jury was to decide whether petitioner "actually intended to kill the victim, either as a primary target or as someone within a kill zone."

Despite the accuracy of the instruction in certain regards, however, the instruction was deficient in that it did not require the jury to examine the circumstances of the shooting. (See *Canizales, supra,* 7 Cal.5th at p. 607.) Moreover, the prosecution's closing argument misstated the instruction given by the court. (See *Mumin, supra,* 15 Cal.5th at p. 210 [prosecution argument exacerbated error in instruction].) The prosecutor stated: "If they are in the kill zone, it's not defined as a concrete thing, but if they are in the area of the kill zone, taking shots in that area, they are also victims of attempted murder." This argument effectively dispensed with the requirement of

13

a specific intent to kill, instead suggesting that an attempted murder conviction merely required that the victim was "taking shots."

Because of the combined error, "there is a reasonable likelihood that the jury understood the kill zone instruction in a legally impermissible manner." (*Canizales, supra,* 7 Cal.5th at p. 614.) We therefore determine whether the error was harmless beyond a reasonable doubt as to the attempted murder conviction on count 5. (*Mumin, supra,* 15 Cal.5th at p. 210, citing *Aledamat, supra,* 8 Cal.5th at p. 13.) Pursuant to this standard, we "must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, [the court] determines the error was harmless beyond a reasonable doubt." (*Aledamat,* at p. 13.) "In other words, we must determine ' "whether it is clear beyond a reasonable doubt that a rational jury would have rendered the same verdict absent the error." ' " (*People v. Cardenas* (2020) 53 Cal.App.5th 102, 117 (*Cardenas*), quoting *Canizales,* at p. 615.)

We conclude that the defective kill zone instruction and argument were harmless beyond a reasonable doubt. As detailed above, there was overwhelming evidence that petitioner intended to kill Coleman. Indeed, based on the evidence presented, there was no likelihood that the jury, which made a finding of specific intent to kill Darden, would not have also determined that petitioner harbored an intent to kill Coleman.

The attack occurred in direct retaliation for the killing of Sipple, an ally gang member. The preparation for the "mission," the rapid execution of the shooting, and the choice to open fire in an area at the heart of Rolling 40's territory demonstrated a premeditated effort to maximize lethality.

Moreover, petitioner's own statements left no room for doubt that he intended to kill everyone in the kill zone. He admitted "dumping" his gun, firing five or six times, at what he thought was a group of

14

Rolling 40's members standing next to Darden's car in retaliation for the killing of Sipple.

Finally, the evidence surrounding the shooting demonstrated an intent to kill. Petitioner fired at least five times from close range at two tightly grouped people. Coleman testified that she was standing "right real close" to Darden, and that, when she looked over at Mosley and petitioner "they just started shooting." Darden and Coleman were standing near an alleyway and hemmed in on one side by Darden's car, and the primary target, Darden, was hit by a bullet. The force used by petitioner was more than sufficient to create a lethal zone around Darden and including Coleman.

Given these facts, it was not reasonably possible that the jury concluded that petitioner shot at Coleman merely because she was in the kill zone, without intending to kill. (See *Cardenas, supra,* 53 Cal.App.5th 102, 117, citing *Chapman, supra,* 386 U.S. 18, 24 ["Reversal is required if there is ' " 'a reasonable possibility' " ' that the error may have contributed to the verdict"].) We therefore conclude that error in the kill zone instruction and related argument was harmless beyond a reasonable doubt.

## DISPOSITION

The petition for writ of habeas corpus is denied.

NOT TO BE PUBLISHED.


LUI, P. J.

We concur:


ASHMANN-GERST, J.


CHAVEZ, J.